UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

AFSHIN SAZEGARI                                                                                            PLAINTIFF

v.                                                                          CIVIL ACTION NO. 3:04-CV-679-S

GEICO GENERAL INSURANCE COMPANY                                                          DEFENDANTS

### MEMORANDUM OPINION

This matter is before the court on motion of the defendant Geico General Insurance Company ("Geico"), for summary judgment (DN 77). For the following reasons, the motion will be granted.

### BACKGROUND

This action arises from a property damage claim submitted to Geico by the plaintiff, Afshin Sazegari ("Sazegari"), for two vehicles insured by Geico which Sazegari claims were damaged in a parking lot flood on October 12, 2001. On that day, Sazegari notified Geico that his vehicles, a 1998 BMW Z3 and a 2000 Ford Focus, were sitting in a pool of water in a parking lot near his apartment. He also notified Geico that Officer Harvey Hite ("Officer Hite") of the St. Matthews Police Department investigated the damage.

On October 22, 2001, Geico adjuster Karen Deerr arrived at the parking lot to inspect the vehicles. Deerr found them in a relatively flat parking lot full of mud up to the dash. She immediately became suspicious of Sazegari's claim. Because the vehicles were located in the middle of a large flat asphalt parking lot with no muddy areas in close proximity, the quantity of mud in the interior of the vehicles "didn't make any sense" to Deerr. Additionally, Deerr found inconsistencies in the way the mud covered the interior of the vehicles. Deerr felt that if the mud was the result of floodwaters as described by Sazegari, other areas in the vehicles should have also been covered with mud. Because of the

damage, however, Deerr declared the vehicles a total loss and obtained computerized appraisals of the vehicles from CCC Valuescope. Based on the information provided by Deerr, CCC appraised the BMW at $25,100 and the Ford at $12,7800.[1] After completing her inspection and obtaining the CCC appraisal, Deerr referred Sazegari's claim to Geico's Special Investigations Unit ("SIU") for further investigation.

SIU assigned investigator Craig Van Atta ("Van Atta") to Sazegari's claim. Van Atta reviewed the photographs taken by Deerr during her inspection of the vehicles and also became suspicious of Sazegari's claim in light of the "relative flatness of the terrain/parking lot." Van Atta hired an independent investigator, Don Fleming, to inspect the location where the damage occurred and to obtain pictures so that he could better examine the topography of the parking lot. After obtaining the additional photographs, Van Atta concluded that, because of the relative flatness of the parking lot, the surrounding structures would have also been flooded if the floodwaters were at the height necessary to create the damage seen on the interior of the vehicles.

Van Atta directed Fleming to discuss Sazegari's claims with Officer Hite and area residents. Officer Hite told Fleming that on the night he was dispatched to check on Sazegari's vehicles, the water was between two feet deep and waist high and that it looked like it was half way up the doors of the vehicles. Area residents, however, told Fleming that water in the parking lot could not have risen as high as Sazegari and Officer Hite claimed. Fleming also met with an employee of the repair shop where the vehicles were towed after they were inspected by Deerr. The employee "kind of laughed" when asked if he thought the cars were flooded and stated that "it looked like someone scooped up a bunch of mud and put it on the seats and dash." Fleming informed Van Atta that in his opinion, "there is no way this loss could have occurred as indicated by the insured."

---

[1] In addition to providing an appraisal of the vehicles, CCC reported that both vehicles had previously been wrecked and had sustained severe damage. Sazegari had purchased these vehicles as salvage and rebuilt them.

Van Atta contacted the Emergency Management Agency of Louisville and Jefferson County and was told that on the night the vehicles were damaged there was "no indication of widespread flooding" in the area where the damage allegedly occurred. Van Atta also contacted Louisville Metropolitan Sewer District and was informed they had not received any reports of localized ground flooding in that area.

On November 12, 2001, the thirtieth day after he had initially notified Geico of his claim, Sazegari called Geico numerous times. According to Geico's claim log, Sazegari stated that "he knows his rights and that Geico only has 30 days to resolve or deny claim" and that "he would be getting an attorney and filing a complaint with the insurance commission if his claim was not resolved today."[2] Geico informed Sazegari that his claim required further investigation.

On November 13, 2001, Sazegari faxed Geico a statement prepared by Officer Hite which stated:

On 10-12-01 I was dispatched to take a report on damage to two vehicles which were parked on the Masonic Home parking lot. Upon arrival, I observed two vehicles partially submerged in water, parked in the middle of the parking lot. We had a heavy rain a few hours prior to my being dispatched on this run. The owner of the vehicles, Mr. Sazegari, met me on the lot and made a request for a damage report on the vehicles. I informed him that we do not take reports when no criminal offense or vehicular accident has occurred. I took two pictures of the vehicles with my camera and gave them to Mr. Sazegari, along with my business card, an[d] informed him to contact his insurance company about the damage.[3] The water on the vehicles at this time was approximately 5 to 8 inches below the windows on the vehicles.

---

[2] 806 KAR 12.095 § 6(1)(a) provides, in relevant part that "[a]n insurer shall... affirm or deny liability on claims within a reasonable time and shall offer any payment due within thirty (30) calendar days of receipt of due proof of loss...." 806 KAR 12.095 § 6(2)(a) provides, however, "[i]f the insurer needs more time to determine whether a first party claim should be accepted or denied, it shall so notify the first party claimant within thirty (30) calendar days after receipt of the proofs of loss, giving the reasons more time is needed."

[3] Officer Hite's photographs were taken in the dark and were completely black.

The following day, Sazegari filed a complaint with the Department of Insurance stating that "the insurance company is trying to come up with a reason to deny the claims and after 30 days they still don't have an answer." Sazegari's complaint was assigned to Price Huston ("Huston"), a Consumer Complaint Investigator with the Department of Insurance. During the course of investigating Sazegari's complaint, Huston performed an inspection of the parking lot where the vehicles were damaged and discussed Sazegari's claim with Officer Hite and other individuals that lived or worked near the parking lot.

After conducting his investigation, Huston concluded that Geico had handled Sazegari's claim appropriately. Huston informed Geico by letter that he had spoken to between twenty and twenty-five people about the parking lot and was told that the deepest puddle anyone had ever seen in the parking lot was approximately six to eight inches deep.[4] He also stated that he was told by the occupants of the single family homes and apartments near the parking lot that if water had risen as high as Sazegari and Officer Hite claim, it would have flowed into their ground level floors. Huston stated that Officer Hite's statement "almost had to be false" and that he had initially planned to report Officer Hite "to our Fraud Unit for investigation [as t]here is no way that there could have been that much water in the parking lot without it being in all of the buildings and dwellings surrounding the parking lot." Huston, however, concluded after talking with Officer Hite that Hite "had viewed the vehicles from a distance of about 30 feet," that his "recollection was enhanced by Mr. Sazegari," and that "he seems to be vague about how the water actually was on the vehicles."

In January 2002, Geico retained an independent appraiser, John Chaney ("Chaney"), to inspect the vehicles and provide Geico with an opinion of their fair market value. Chaney concluded that, because both vehicles had too many characteristics of rebuilt total losses, they had virtually no market

---

[4]Geico later retained an engineer from the Louisville firm of Birch, Trautwein & Mims, Inc. to examine the parking lot and provide an opinion as to the maximum height that floodwaters could have reached in the parking lot. The engineer assumed several worse case scenario factors and concluded that the highest the water could have reached was 1.05 feet, far below the height stated by Sazegari and Officer Hite.

value other than the parts that could be sold for scrap. Chaney placed a value between $0 and $3,500 on the BMW, and a value of $0 to $2,700 on the Ford.

Within two weeks of receiving Chaney's appraisal, Geico made a compromise offer of settlement to Sazegari in the amount of $1,500 for the BMW and $1,350 for the Ford. Geico indicated that the basis for the offer of settlement was that they disputed that the vehicles sustained water damage as alleged by Sazegari and that both vehicles had previously been wrecked and rebuilt resulting in a diminished value. Sazegari refused the offer and submitted his own appraisals from two used car dealers placing the value of the Ford at $8,950 and the value of the BMW between $21,950 and $24,850. A settlement could not be reached, and on April 17, 2002, Sazegari filed suit in Jefferson Circuit Court seeking to recover for breach of contract based on Geico's failure to pay his claim under the policy, and for bad faith based on Geico's handling of his claim.

Geico removed the action to federal court. During a settlement conference conducted before the federal magistrate judge, Geico raised its offer to $8,000 and offered to allow Sazegari to keep the vehicles. Sazegari lowered his demand to $13,500 but felt that the vehicles were worthless. Unable to settle, the parties agreed to the dismissal of Sazegari's bad faith claims and agreed to proceed on the breach of contract claim in state court. The case proceeded to a jury trial and Sazegari was awarded $34,775 for the damage to his vehicles.

After succeeding in the first lawsuit, Sazegari re-filed his bad faith claims against Geico. Sazegari has asserted claims for violation of the Kentucky Unfair Claims Settlement Practices Act, the

Kentucky Consumer Protection Act, and the tort of bad faith.[5] Geico has moved for summary judgment on these bad faith claims.

## DISCUSSION

A party moving for summary judgment has the burden of showing that there are no genuine issues of fact and that the movant is entitled to summary judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976). Not every factual dispute between the parties will prevent summary judgment. The disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986). The dispute must also be genuine. The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. *Id.* The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968). The evidence must be construed in a light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. V. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

In support of its motion for summary judgment, Geico argues that Sazegari's bad faith claims are barred by the doctrine of claim preclusion, that Sazegari has failed to provide sufficient evidence to establish his bad faith claims, and that Sazegari lacks evidence of damages. Judge Heyburn has twice ruled that the doctrine of claim preclusion does not operate to bar Sazegari's claims in this case (DNs

---

[5] The parties refer to Sazegari's claims simply as "bad faith."

11, 19).[6]  Geico has offered no new or additional evidence in support of its claim preclusion argument. Accordingly, the court will not revisit this issue.  Additionally, because the court finds that Sazegari has not provided sufficient evidence to establish his bad faith claims, the court need not consider whether Sazegari lacks evidence of damages.

A single test under Kentucky law exists for the merits of bad-faith claims, whether brought under common law or statute. *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 527 (6th Cir. 2006).  Kentucky law dictates that:

> [A]n insured must prove three elements in order to prevail against an insurance company for alleged refusal in bad faith to pay the insured's claim: (1) the insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed....

*Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 452 (Ky. 1997) (quoting *Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993), and *Federal Kemper Ins. Co. v. Hornback*, 711 S.W.2d 844, 846-47 (Leibson, J. dissenting)).

Before a cause of action for bad faith exists, a plaintiff must have evidence sufficient for the jury to conclude that there was "conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Wittmer*, 864 S.W.2d at 890. "If [there is no such evidence], the cause of action cannot be maintained." *Motorists*, 996 S.W.2d at 454.  This evidentiary threshold is exceedingly high, as the court in *United Services Auto. Ass'n v Bult*, 183 S.W.3d 181 (Ky.App. 2003) explained:

> The evidentiary threshold is high indeed. Evidence must demonstrate that an insurer has engaged in outrageous conduct toward its insured.  Furthermore, the conduct must be driven by evil motives or by an indifference to its insureds' rights.  Absent such evidence of egregious behavior, the tort claim predicated on bad faith may not proceed to a jury. Evidence of mere negligence or failure to pay a claim in timely fashion will not suffice

---

[6] This case came before this court after Judge Heyburn recused himself (DN 23).

>to support a claim for bad faith. Inadvertence, sloppiness, or tardiness will not suffice; instead, the element of malice or flagrant malfeasance must be shown.

*Bult*, 183 S.W.3d at 186. The court finds no evidence in this case that Geico acted outrageously because of an evil motive or reckless indifference in its handling of Sazegari's claim.

Sazegari has failed to establish that Geico acted outrageously with respect to its investigation of Sazegari's claim. The record indicates that Geico became suspicious of Sazegari's claims upon its first inspection of the damaged vehicles. Sazegari takes issue with Geico referring his claim to SIU. Sazegari, however, does not dispute the fact that the damage to his vehicles was suspicious. Indeed, Sazegari's own expert testified that the presence of the mud in the vehicles was "a mystery." Sazegari offers no evidence indicating that Geico's referral under these circumstances was inconsistent with Geico's handling of similar claims. Sazegari also takes issue with Geico's lack of reliance on Officer Hite's statement. While Officer Hite did confirm Sazegari's contention that the floodwaters in the parking lot were deep enough to cause the type of damage that occurred to the vehicles, his statement was contradicted by every other individual interviewed by, or on behalf of, Geico. Moreover, the Department of Insurance informed Geico that based on the inconsistencies between Officer Hite's statement and the results of its investigation into Sazegari's complaint, it was considering investigating Officer Hite for fraud. Under these circumstances, Geico cannot be said to have acted outrageously because of an evil motive or reckless indifference in either referring his claim to SIU or in not relying on Officer Hite's statement.

Sazegari has also failed to establish that Geico acted outrageously in offering to settle Sazegari's claim. Sazegari points to Geico's hiring of an independent appraiser to appraise the vehicles and its reliance on this appraisal in forming the basis of its compromise settlement offer. Sazegari argues Geico's evil motive is evidenced by its reliance on the lower values assigned to the vehicles in this appraisal, to the exclusion of the higher values assigned to the vehicles in the appraisal obtained by

Deerr.  The record indicates, however, and Sazegari does not dispute, that the appraisal obtained by Deerr did not take into account the actual condition of the vehicles in their rebuilt condition.  Geico obtained the independent appraisals only upon learning that Sazegari had rebuilt the vehicles after purchasing them as salvage.  Although, Sazegari provided Geico with appraisals placing a higher value on the vehicles, Sazegari testified that the appraisers did not actually inspect the vehicles.  Geico's compromise offer of settlement was in the middle of the range of values provided by the only appraiser that actually inspected the rebuilt condition of the vehicles.[7]  It can hardly be said that Geico acted outrageously because of an evil motive or reckless indifference in hiring an independent appraiser and relying on the independent appraisal to form the basis of its compromise settlement offer under these circumstances.[8]

The evidence in this case simply does not support a finding that Geico's conduct in handling Sazegari's claim was outrageous because of an evil motive or reckless indifference to Sazegari's rights.  *See Wittmer*, 864 S.W.2d at 890; *Bult*, 183 S.W.3d at 186.  Accordingly, Geico's motion for summary judgment will be granted.

A separate order in accordance with this opinion will be entered herein this date.

---

[7]Additionally, Geico made the compromise offer of settlement despite its suspicions that the damage to the vehicles did not occur in the manner claimed by Sazegari.

[8] Sazegari also claims that Geico's evil motive or reckless indifference is established because Geico eventually sold the vehicles as salvage for an amount greater than it offered to Sazegari.  Inasmuch as Geico had previously offered to give the vehicles to Sazegari, the court disagrees.